WELSH MANUFACTURING COMPANY *vs.* WALTER F. FITZPATRICK, *C. T.*

JULY 22, 1938.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

360

Moss, J.   This is an action of the case brought against the city of Providence, which is sued in the name of its treasurer, to recover for damages to a building belonging to the plaintiff and located at the southeasterly corner of Oak and Troy streets in that city.   The plaintiff alleged that these damages had been caused by certain sewer construction work carried on by the city in Troy street in July and August 1933.

The plaintiff in its declaration alleged that this work was carried on by the city in such a manner "that the adjacent and subadjacent soil which supported the plaintiff's land was removed", whereupon the plaintiff's land was caused to slip, settle, subside and give way, and that as a result of the settlement of said land, the buildings belonging to the plaintiff upon said land settled and were damaged.   The first count of the declaration was based on the absolute duty of the owner or occupant of one parcel of land not to take away the lateral support of adjoining land belonging to an-

other. The other two counts alleged negligence by the city in the operations carried on by it in the street. The defendant pleaded the general issue to each of the counts and the case was tried before a jury in the superior court. At the conclusion of the evidence it was agreed by the parties that no negligence by the city had been shown, and the last two counts were therefore withdrawn from the consideration of the jury. The jury returned a verdict for the plaintiff for $10,763.82, the exact amount of the claim which the plaintiff, before bringing this action, had filed with the city for the same damages.

The defendant in due course filed a motion for a new trial on the grounds that the verdict was against the law; that it was against the evidence and the weight thereof; that it was against the law and the evidence and the weight thereof; that the damages were excessive and that it did not do substantial justice to the parties. This motion was denied by the trial justice and the case is now before us on the defendant's exception to the denial of this motion and on various exceptions taken by the defendant to rulings by the trial justice as to the admission of evidence and as to the charge to the jury.

On May 1, 1931, the plaintiff purchased from the American Woolen Company the property with which this case is concerned, being the land and improvements thereon located at the southeasterly corner of Oak street, running about east and west, and Troy street, running about north and south. The area of the land is about 40,000 square feet; and on it, at the corner of the streets, there is what may be called a double building. The westerly and much older part of it, referred to at the trial as building No. 1, is located just at the corner and measures 40 feet on Oak street and 60 feet on Troy street. The bottom story of it is about one hundred years old and has walls of rubble, made of rough, irregular stones and mortar. The foundations are of the same construction and are supported by piles driven into the ground.

Some years after it was built two additional stories were added to it, of which the walls are of brick. The easterly part of the double building was referred to at the trial as building No. 2 and is much more modern. It is directly east of building No. 1, with a common partition wall and stairway between them; and it bounds 160 feet on Oak street. There is a wooden frame building which joins onto the south side of building No. 1, but we are not concerned with it.

In 1893 the city ran a 60 inch trunkline sewer through Oak street, on the north side of the property, as far as Troy street, and then continued it north through Troy street. In 1913 a 24 inch trunkline sewer was laid in Troy street from its intersection with Oak street southerly to Magnolia street, the next one south of Oak street, and on west through that street. In 1927 the city laid a 48 inch lock-joint water main about in the middle of Troy street; and between this water main and the lot lines on the east side of that street a 15 inch sanitary sewer was laid to take care of the sewerage of the adjoining lots. Before 1933 a portion of that sewer, from a manhole in Troy street situated a short distance southwest of the southwest corner of building No. 1 to a point in Magnolia street west of Troy street, had settled at some places as much as 2 feet 9 inches.

In 1933 the city, in order to have a by-pass sewer to take the place of the sunken portion of the earlier sewer, laid the 24 inch sewer which is directly involved in this case. This ran from the manhole in a diagonal southwest direction till it reached about the middle of the westerly half of Troy street and then ran south in that half of the street as far as Magnolia street.

Uncontradicted testimony for the defendant showed that just before the work of laying the 48 inch water main began in 1927, a Mr. Marsh, who was then an engineer in the employment of the city, with supervision over that work, had an examination and photographs made of the building involved in this case. He did this because he had observed

cracks which showed in the outside walls of that building and he wished to preserve definite evidence of these cracks. A number of these photographs, clearly proved and identified, were introduced in evidence at the trial of this case.

Some of these photographs clearly show pronounced cracks, roughly perpendicular, in the northerly part of the west rubble wall of building No. 1. One of these cracks extends even into the brick wall above; and one of them, at least, only a short distance south of the northwest corner of the building extends to the ground. Another photograph clearly shows a crack in the brick wall on the north side of the same building, located about midway and running from lower left to upper right between two outside door openings on the second and third floors, respectively. Mr. Marsh also testified that at the time when these photographs were taken he observed other cracks, which did not show in any of the photographs. This evidence and other evidence in the case on both sides showed convincingly, in our judgment, that there had been a pronounced settlement of the west rubble wall of building No. 1, at and a little south of the northwest corner of that building, in or before 1927, some six years or more before the beginning of the excavation by the city which is directly involved in the present case.

At the trial the testimony showed clearly that the excavation which is now complained of began on July 5, 1933 at the manhole near the east side of Troy street, just about 72.1 feet from the northwest corner of the building and just about 22.4 feet southwest from its southwest corner. As above stated, it is admitted that the work was done with due care. The excavation varied in width, as the work progressed, from 4 feet to 6 feet and in depth from 11.7 feet to 13.75 feet. After the street surface was taken off, the soil dug into was miscellaneous filling down to a depth of about 4 to 5 feet, where peat was encountered that varied in thickness from 6 inches at the manhole to a greater depth at Magnolia street. The rest of the excavation was through

sand. The witnesses for the defendant on the subject testified that it was coarse sand, while several witnesses for the plaintiff testified that it was very fine sand.

A few feet from the surface of the ground, water was encountered and, to prevent it from seriously interfering with the digging, a narrow trench was dug down, to the depth of a foot, in the middle of the sewer trench; and an underdrain was then installed leading to a hole called a "sump", which was dug down into the ground some feet southwest of the manhole. The bottom of this sump was a little below the level of the underdrain and was covered to a depth of several inches with gravel to prevent sand from coming up through the bottom with the water; and the sides of the sump were sheathed for a similar purpose. A centrifugal pump was then installed, which drew water from the sump and discharged it on the street at a point not far south, from which it ran over the street to an opening into the main sewer.

As to whether sand was drawn out from the sump, with the water, was one of the principal issues in the case. Witnesses for the defendant testified that practically no sand at all was drawn out with the water, while witnesses for the plaintiff testified that very large quantities of very fine sand were so drawn out. The plaintiff contended that this alleged withdrawal of large quantities of sand from the bottom of the trench caused a movement of a stratum of sand, filled with water, which seems to have underlain, some distance down, all the surface of the land in this neighborhood.

The evidence shows that about a month or six weeks after the completion of this sewer construction work in Troy street the plaintiff's building No. 1 began to settle and crack, especially in its north side and on the northerly part of its west side, and that it continued to settle until it was badly damaged. In consequence, the plaintiff contends that the evidence in the case makes it one that is "on all fours" with the

case of *Prete* v. *Cray, C. T.*, 49 R. I. 209, 141 A. 609, in which a verdict for the plaintiff was sustained by this court.

There is much similarity between the two cases in their facts; and the same rules of law govern them as to liability, without intentional wrongdoing or negligence, for damage caused by removing the lateral or subjacent support of a neighbor's land. But there are also, between the evidence in that case and in this, marked differences, on account of which the application of the same rules of law may lead to a different result in this case on the issue of liability.

For one difference, the excavation in that case was near the sidewalk in front of the plaintiffs' land and was about 40 feet deep; and at a depth of 38 or 40 feet a bed of quicksand was reached, which extended from the excavation into the adjacent soil of the plaintiffs and which, according to the testimony of the city's contractor and engineer, flowed somewhat like water. There, great quantities of this quicksand came from under the soil of the plaintiffs' adjoining land and came up through the bottom of the defendant's excavation, and was drawn out by the defendant. In the instant case the depth of the trench was not shown to have been more than 14 feet at any point; it was admittedly not shown that there was any quicksand in it; and the testimony was in irreconcilable conflict as to whether any considerable quantity of any kind of sand was drawn off, with the water, from the trench.

For another difference, it was admitted in that case that, following the defendant's operations in the street, and as a result of them, the land sank at the curb; and the sidewalk and a part of the plaintiffs' lot slid forward, from the front foundation of their house, where the subsidence was about 6 inches, down to the curb of the sidewalk, where the subsidence was from 12 to 18 inches. This court said that it was "clearly apparent" that the subsidence of the soil was not due to the weight of the plaintiffs' building. In the instant case there was no such admission as in that case; and there

was no evidence of any subsidence of the soil between the trench dug by the defendant in the street and the plaintiffs' building No. 1, or anywhere else unless it was under the northwest corner of the concrete ground floor of that building. Nor was there any evidence of a lateral movement of the soil except immediately west of the northwest corner of that building. Moreover, it is far from "clearly apparent" that there was *any* injurious subsidence of the soil that was not due to the weight of the building. The evidence as to any subsidence or lateral movement of the soil will be considered later in this opinion.

Another very important difference is that in the earlier case, so far as the opinion shows, the plaintiffs' foundation walls did not rest on piles, while in the instant case they did. This difference also will be considered in this opinion; but before considering the evidence as to these last two differences and their effect upon the decision of this case, we deem it proper to restate a rule of law which was clearly recognized and approved in the opinion in the above case and which has a special pertinency in the instant case.

The rules of law governing in this state the duty of a municipality, in carrying on such operations as are involved in the instant case, toward the owner of adjoining land, were stated by this court in *Prete* v. *Cray, C. T., supra*, at page 212 (611), in the following language, and we see no reason for not applying the same rules in the instant case: "At the outset we hold that in this state, if, in the exercise of a privilege to construct or repair a sewer in a public street, a municipality makes excavations therein, it is subject to the same duty not to interfere with the lateral support of land abutting on the street that the law imposes upon adjoining landowners. Between adjacent landowners, the general principle in this regard is that each has an absolute property right to have his land laterally supported by the soil of his neighbor, and if either in excavating on his own premises so disturbs the lateral support of his neighbor's land as to cause it, *in*

*its natural state, by the pressure of its own weight,* to fall away or slide from its position, the one so excavating is liable. This right of lateral support applies only to the *land* of the adjacent owner, and does not include the right to have the weight of the building placed upon the land also supported. And when, upon an excavation made on his own land by an adjoining landowner, a building upon the adjacent land *by its weight and pressure* causes the building itself and the land upon which it stands to sink, then in the absence of negligence the one making the excavation is not liable for injury to the building resulting from its subsidence." (italics ours)

This court then discussed the situation, which sometimes arises, "where, as the result of an excavation made on his own land by one adjoining landowner, there is a disturbance of the lateral support to his neighbor's land due solely to the weight of the neighbor's land itself in its natural condition, and there has also been injury to a building on such neighbor's land resulting from the subsidence of the land, which subsidence cannot be ascribed *in any degree* to the pressure of the building upon the land." (italics ours)

This court, in the same opinion, recognized the fact that there is a conflict of authority among the courts of last resort in this country over whether or not, in the situation just stated, the adjoining landowner is entitled to recover for the damages to his building, as well as for those to his land itself. After discussing the two opposing rules of law, it approved, at page 213, 214 (612) the following rule, supported by many of the cases which it cited, that: "There is no legal duty in the landowner A to furnish lateral support for the *building* of his neighbor B, and if, without negligence on A's part, B's soil falls away *solely* by reason of A's excavation on his own land and *due in no respect to the weight of B's building,* . . . B is entitled to recover compensation for the injury to his building solely be-

cause it is a part of his damage for the actionable wrong which A has committed." (italics ours)

We reaffirm the rules of law above stated and find that they govern the rights and duties of the parties to the instant case. For valuable discussions of many cases on this subject see notes in 50 A. L. R. 486, and 59 A. L. R. 1252, the latter being a note to *Prete* v. *Cray, C. T., supra,* which is itself reported in 59 A. L. R. 1241.

After considering the language of the opinion in *Prete* v. *Cray, C. T., supra,* and many cases which are in harmony with it, we are convinced that, even if we assume, for our present purpose, that the city's operations were at least a contributing cause of the damage to the plaintiff's building, the plaintiff is entitled to recover such damage *if, and only if* it has shown, by a preponderance of the evidence, that its land fell away *solely* by reason of the excavation by the city in Troy street and in no degree by reason of the weight of the building; and that the damage to the building resulted from such falling away of such soil.

The evidence upon which the plaintiff must rely, in support of its contention that these necessary conditions to a recovery by it in this case are satisfied, is almost solely that of its expert witnesses, Shaw, Whipple and Ballou. Shaw, an architect of admittedly high standing, made for the plaintiff in May 1934 a thorough examination of its building, including taking levels and making measurements, on the basement floor, or ground floor, as it is called, and on the second and third floors, to determine how much the building had settled. As a result of his examination, he made drawings, which were introduced in evidence, and which, among other things, showed the levels of each floor at a number of places, including points next to the east wall and the opposite points next to the west wall.

He testified from one of these drawings that on the ground floor he found a settlement of just about 6 inches at the northwesterly corner, much less at a point a few feet south,

and practically none at about the middle of the west side and at the southwest corner. But it is clear, from an examination of his testimony and the drawings, that when he said "settlement", what he really was testifying to was the difference which he found between the floor level at each of several points on the east side of the floor and its level at the opposite point on the west side. It is clear, also, that his conclusion on which his testimony as to settlement was based, viz., that the differences, thus found, showed just how much these points on the west side of the floor had settled, after the beginning of the 1933 excavation work by the defendant, was itself entirely based on the assumption that the floor was level when that excavation work began. We have found no evidence in the case that this assumption was correct; and it is in our judgment an unjustified one, especially in view of the evidence, which we have discussed *supra*, as to the settlement which had taken place in the building before the examination and photographs were made of it in 1927, and in view of the age of the lowest story of the building and the absence of information that this floor ever was level in recent years. The invalidity of this assumption largely destroyed the weight to be given to Shaw's testimony as to the amount of the settlement of the floor.

This weakness in his testimony is particularly important in connection with the testimony which he gave a little later that he found the settlement of the west wall at the northwest corner of the building at the ground floor to be only about 4 inches. That finding and his previous finding that the settlement of the ground floor at that corner was about 6 inches indicated, he testified, that at that corner the ground floor had settled about 2 inches more than the wall had. On that indication, afterwards treated as a definite finding, was very largely based the opinions of those of the plaintiff's expert witnesses who gave opinion testimony

that the plaintiff's soil under its building had settled by reason of its own weight.

Moreover, an examination of the testimony of Shaw and his drawings clearly shows that he calculated the amount of the settlement of the west wall of the building by ascertaining what he called the settlement of the floors of the second and third stories of the building on their west sides, and that he did that by ascertaining how much the level of points along the west side of each floor was below the level of the opposite points on the east side of that floor. His treatment of this difference, in each instance, as the amount of the settlement of the floor on the west side was based on the assumption that the floors were level just before the defendant's excavation began. Again the assumption was, in our judgment, unjustified, in view of the condition of the building in 1927 and the age of it and the lack of information as to whether it was ever level in recent years.

Professor Bohl, an expert witness for the defendant, who also had examined the premises, testified from his examination that apparently the wall on the west side of the building had settled, at the level of the second floor, more than the floor beams there had settled, which would be inconsistent with the finding by Shaw that the ground floor at the northwest corner had settled about two inches more than the wall; and Bohl's testimony was uncontradicted.

It seems to us worthy of comment also that Shaw did not testify to any ocular evidence that the ground floor of the building at the northwest corner, a floor which he testified was of concrete three inches thick, spread on the ground, had settled about two inches more than the wall at that corner; and in our judgment there would naturally have been some ocular evidence of that, if true, since the concrete would naturally have been laid from wall to wall and would then have made a union with the inside rough rubble surfaces of the walls, as Bohl, without being contradicted, testified that it would have done. Bohl

testified that therefore the west wall in going down, would have had a tendency to pull the floor down with it. If the floor was attached to the walls, a part of the weight of the building might well have pressed down on the soil below. If it was not so attached, at least the weight of the three-inch concrete floor and of the contents of the first story of the building would have been carried by the ground beneath.

We do not find that Shaw testified that in his opinion the ground under building No. 1 would have gone down, if no part of the building and ground flooring had been there. Plaintiff's expert witnesses Whipple and Ballou did testify to that effect; but it is obvious, from their testimony, that their opinion that the ground beneath the plaintiff's building No. 1 would have settled just the same, if there had been no building above it, was based mainly on Shaw's testimony that the ground floor of that building had settled about two inches more than the western wall had settled at and near the northwest corner. Therefore and because of what we have stated as to the testimony with regard to the settlement of the ground floor of the building, we are convinced that their opinion on that subject was entitled to very little, if any, weight.

The plaintiff's expert witness Whipple did not really believe that the plaintiff's ground under the building would have settled of its own weight in its natural state and would have gone down just the same, if the building had not been above it, is clearly and strongly indicated by some of his testimony. Near the close of his direct examination he had testified, on the basis of statements made in a very long hypothetical question, that in his opinion "the settlement of the building was caused by a change of the soft soil in and around the building;" that the change was brought about by either pumping or excavation, or both, of the adjacent soil; that the defendant's excavation and operations, as described in the hypothetical question, had

caused the settlement of the building by unbalancing the unstable soil; and that the fact that the northwestern corner of the plaintiff's building, about 71 feet away from the excavation, was the one that settled, while the southwestern corner, which was only about 27 feet away from the excavation apparently did not settle, did not affect his opinion, because in soft soil it is almost impossible to judge which way the change is going to be.

But on cross examination, when asked whether, if sand from outside the sheathing of an excavation moved inside of it, the land outside would not go down, his answer was: "It would go down where there is a.greater pressure . . . . When there is more pressure on the foundation walls and the piles—when there is more pressure per square foot than there is on one foot outside of the area of the building."

When asked if he meant that the pressure on the soil is greater where you have a building on it than it is where there is no building, he said: "Correct". When asked whether the probable reason why "it (the context showing that "it" meant the settlement) came out where the Welsh building is, is that there was pressure. Was it the weight of the building?" he answered "Yes". It is true that in other places in his cross-examination, as well as in his direct examination, he said that the plaintiff's land would settle if it were in its natural state without a building on it. But, in view of all his testimony and what it was based on, it is our judgment that it is entitled to little, if any, weight on this precise question.

The plaintiff's expert witness Ballou answered a very long hypothetical question, which included the assumed datum, the evidence for which we have above discussed, that the ground floor of the building had settled, at the northwest corner, two inches more than the foundation of the building, and the assumed datum that on the north side of the building "there has been a movement of the masonry to the west along the ground level of one and

one-eighth inches." In his answer, emphasizing especially these two data, he stated, as his opinion, that the settlement of the building "resulted from a cause wholly outside of the limits of the building", and that "the construction and installation of the sewers and water pipes in the adjacent streets was the cause of that settlement."

Still answering the hypothetical question and emphasizing the second of the above data, he added that in his opinion the sewer construction in 1933 caused the building to settle "by disturbing the soft strata of sand underneath the building and allowing it to move laterally." He then, at the suggestion of the plaintiff's attorney, emphasized, as supporting this opinion, the first of the above data, namely, that at the northwest corner of the building the concrete floor settled about 2 inches more than the wall. He said also: "The weight of the building does not come on there, so that the floor has settled, the ground floor has settled almost entirely because of the weight of the filling and mother earth below the floor, . . . ." But he ignored the obvious fact that if none of the weight of the building came on that floor, the settlement of the floor could have had no part in causing the settlement of the building.

The second datum, above mentioned, that there had been "a movement of the masonry to the west along the ground level of one and one-eight inches", came solely from testimony of the plaintiff's witness Shaw that the "bottom" of the Oak street wall of the old building No. 1, evidently meaning that wall at the ground level, had moved out toward Troy street and away from the new building, No. 2, an inch and one-eighth. He added: "That is determined by the width of the cracks. There is a wide crack here, and there are other cracks along the face", evidently referring to a photograph, which was taken after the settlement and introduced in evidence, of the north face of the Oak street wall of the old building. But no

other evidence was introduced for the plaintiff as to such cracks.

On the other hand the defendant introduced testimony by its witness Bohl, above mentioned, that the wall could not at the ground level have moved towards Troy street without producing cracks which would show between the level of the ground and 5 or 6 inches above and of which the sum of the widths must equal the total displacement of the wall. So far, that was in exact accordance with testimony of Shaw above quoted, that the moving of the wall toward Troy street was determined by the width of the cracks. But Bohl added that, a few days before he testified, he and the defendant's witness Marsh had examined the Oak street wall and had found that there was only one crack in it at or near the ground level; that this one was in the wall of the new building at the common doorway to the two buildings; that its width was only one-quarter of an inch; and that it did not extend below the ground level.

As a result of his examination he stated that it was his opinion that it was "absolutely impossible for the building to have moved laterally an inch and one-eighth." His testimony was fully corroborated by that of Marsh. The photographs, which were filed as exhibits, including the one last above mentioned, were consistent with the testimony of these witnesses in this matter and no rebutting evidence was put in by the plaintiff. In this state of the evidence we are convinced that any finding by the jury that there was a lateral movement toward Troy street of the base of the north wall or the base of the northerly part of the west wall of building No. 1 would have been contrary to the clear and strong preponderance of the evidence in the case.

By reason of this conclusion and the one which we have previously stated, as to the settlement of the concrete ground floor of the building, and of other conclusions which

we have reached and stated in this opinion, we are convinced that, apart from the effect which the sewer-construction operations of the defendant in 1933 may have had upon the piles which were under the foundation walls of the plaintiff's building No. 1, at and near its northwest corner, a finding by the jury that these operations caused a subsidence of the ground under that building, and would have caused it if the building had not been there, and that this subsidence caused the building to settle would have been against the clear preponderance of the evidence.

As to the matter of the piles, the situation was clearly described by the testimony of witnesses for the plaintiff, who had caused excavations to be made on both sides of the foundation walls on Oak street and Troy street, at and near the corner, to the depth of about 5 1/2 feet below the ground level and 11 or 12 inches below the bottom of the footings of the walls, and had examined the tops of the piles there. The foot of each wall was about 4 1/2 feet below the surface of the ground and rested on large capstones, which extended out on each side of the wall and in turn rested on the wooden piles, driven into the ground. Each capstone was supported by two and in some cases three piles, which were about 9 to 10 inches in diameter. Thirteen of these piles were examined and most of these were found to be in good condition.

In the process of excavating the holes to examine the piles, a stratum of about 4 feet of fill, composed of ashes, sand, cinders, and the like, was first found. Below that was a stratum of peat, indicating that the land was swampy before it was filled over. This was about 15 inches thick and was "sopping wet". Below that was a stratum of rather fine sand and clay, mixed, and then a fairly thin stratum of gravel, below which there seemed to be rather fine wet sand.

The ground water level was found to be about 5 1/2 feet below the surface of the ground and there was plenty of

water there. The strata found in these exploratory excavations were just about the same as were encountered by the city in the sewer-construction work involved in this case, except as to the fineness of the sand, which was in dispute, and as had been encountered in excavating for the construction of a building at the northwest corner of Oak and Troy streets, as testified to by the plaintiff's witness Whipple. In view of the facts stated as to the stratum of fill over the stratum of wet peat, there is some question in our minds whether the ground under the plaintiff's building could be held to be in its "natural state".

The testimony of the plaintiff's witnesses who had examined the piles was that the tops of them were 11 or 12 inches above the ground water level. The testimony of the plaintiff's expert witnesses was that the sustaining properties of a pile depend not only upon the resisting power of the stratum in or on which its foot rests, but also upon the pressure and friction of the soil surrounding its shaft, which are increased somewhat by the fact that ordinarily a pile tapers in somewhat from its top to its foot.

In view of these facts and assuming, for our present purpose, that there was evidence from which the jury could reasonably find that the sewer-construction operations were such that they resulted in diminishing the resisting powers of the strata through and into which passed the piles supporting the foundation walls of the plaintiff's building, at and near its northwest corner, was there sufficient evidence to support a finding by the jury that such changes in the soil took place, around and beneath these piles, that they would have sunk down, even if the foundation walls, carrying the weight of the building, had not been pressing down upon them?

Apparently the opinion of the plaintiff's expert witness Shaw was in the negative, as shown by the following question and answer when he was under direct examination: Q. "You say you saw no indication of a compression of the

piles. What happened to those piles, if they were bearing this building, when it settled, when the building did settle?" A. "When the foundation walls settled *the piles were pushed down.* They were not broken off at the top or crushed on the top." (italics ours) It is true that some time later, making an explanation which was not as spontaneous as his previous testimony, he testified that what he meant was that the piles and walls "went down together". But, so far as we have found, in examining the testimony carefully, neither he nor any other witness expressed any opinion that any of the piles would have gone down, if they had been carrying no part of the weight of the building.

From our examination of the transcript we have reached the conclusion that a finding by the jury to that effect would have been against the clear preponderance of the evidence. We have previously herein reached and stated a conclusion that, apart from the matter of the piles, a finding by the jury that these operations caused a subsidence of the ground under the plaintiff's building No. 1 and would have caused it even if the building had not been there and that this subsidence caused the building to settle would have been against the clear preponderance of the evidence.

Under the rule of law governing this case, as we have stated such rule in an early part of this opinion, the verdict for the plaintiff cannot be sustained if each of these findings would have been against the clear preponderance of the evidence. Because we have reached the conclusions that each of them would have been against the clear preponderance of the evidence, we must hold that the trial justice should have granted the defendant's motion for a new trial. We therefore hold that the trial justice erred in denying the defendant's motion for a new trial and that the defendant's exception to such denial should be sustained. This holding renders it unnecessary for us to discuss any of its other exceptions.

The defendant's first exception, to the decision of the trial justice denying its motion for a new trial, is sustained and the case is remitted to the superior court for a new trial.

*Hoyt W. Lark, David B. Lovell, Jr., Hart, Gainer and Carr,* for plaintiff.

*Daniel E. Geary, City Solicitor; John T. Walsh, Assistant City Solicitor; Francis D. McManus, Assistant City Solicitor,* for defendant.